DECISION ON OBJECTIONS TO THE MAGISTRATE'S DECISION
{¶ 1} Relator, Sears Roebuck Co. ("Sears"), has filed this original action requesting that this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission"), to vacate its order awarding respondent Charles Campos R.C. 4123.57(B) compensation for loss of his right hand and arm, and to enter an order denying said compensation.
 {¶ 2} Pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals, this case was referred to a magistrate who issued a decision, including findings of fact and conclusions of law. (Attached as Appendix A.) In his decision, the magistrate found that the commission's order was supported by "some evidence," and that the commission applied the correct legal standard in rendering its award. Therefore, the magistrate recommended that this court deny the requested writ of mandamus.
 {¶ 3} Relator has filed objections to the magistrate's decision in which it essentially re-argues the same points addressed in the magistrate's decision. In its objections, relator argues that Dr. Wade's report and respondent's testimony do not constitute "some evidence" that supports the commission's order. Additionally, relator argues that the magistrate erred in finding that the commission applied the correct legal standard. However, for the reasons set forth in the magistrate's decision, we do not find relator's objections to be well-taken. Accordingly, we overrule relator's objections to the magistrate's decision.
 {¶ 4} Following an independent review of the matter, we find that the magistrate has properly determined the facts and applied the appropriate law. Therefore, relator's objections to the magistrate's decision are overruled and we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained therein. In accordance with the magistrate's decision, we deny the requested writ of mandamus.
Objections overruled; writ denied.
French and Travis, J.J., concur.
 APPENDIX A IN THE COURT OF APPEALS OF OHIO TENTH APPELLATE DISTRICT
State of Ohio ex rel. :
Sears Roebuck Co., :
 Relator, :
v. : No. 04AP-1266
Charles Campos and Industrial : (REGULAR CALENDAR)
Commission of Ohio, :
 Respondents. :
 MAGISTRATE'S DECISION Rendered on May 13, 2005 Bugbee Conkle, LLP, Gregory B. Denny and Mark S. Barnes, for relator.
Fell Marcus Co. LPA, and Steven E. Marcus, for respondent Charles Campos.
Jim Petro, Attorney General, and Gerald H. Waterman, for respondent Industrial Commission of Ohio.
 IN MANDAMUS {¶ 5} In this original action, relator, Sears Roebuck Co. ("Sears"), requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order awarding respondent Charles Campos R.C. 4123.57(B) compensation for loss of his right hand and arm, and to enter an order denying said compensation.
 Findings of Fact: {¶ 6} 1. On February 22, 1995, Charles Campos ("claimant") sustained severe industrial injuries when he fell from a ladder while employed as an assistant manager of a department store operated by Sears, a self-insured employer under Ohio's workers' compensation laws. The industrial claim is numbered 95-317190 and was initially allowed for:
Internal derangement right knee; sprain/strain lumbar spine; seizures (epilepsy); headaches; tremor; post-traumatic cataplexy and spinal cord contusion; bowel and bladder incontinence; erectile dysfunction; trauma to teeth; depressive disorder.
 {¶ 7} 2. On November 19, 2002, claimant was examined at Sears' request by Ronald R. Wade, M.D. Apparently, Sears requested that Dr. Wade address the question of whether claimant can return to his former position of employment at Sears and whether the industrial injury has reached maximum medical improvement ("MMI"). Dr. Wade reported:
* * * He has a severe tremor in the right hand. That hand tends to assume a claw posture. There has been marked stiffness in the hand. He has trouble writing with the right hand and, in fact, is simply unable to do so. The problem with the right hand is present constantly but is somewhat better now than it was previously. He is currently getting Botox injections into the muscles of the right arm per Dr. Auberle.
* * *
There is a marked abnormality of posture in the right hand. The muscles are extremely rigid throughout the right arm and hand. The right arm and hand shake constantly in a frequency considerably slower than a Parkinsonian tremor and also involves the proximal muscles in an almost dystonic fashion. Fine movements of the right hand are impossible. There also appears to be some weakness in the proximal muscles of the right upper extremity. * * *
* * *
Tests for coordination are impossible for him to perform with the right arm but are done fairly accurately with the left arm. Rapid alternating movements are again impossible for him to accomplish with the right arm but are done well on the left. * * *
Considering the allowed conditions in this claim, Mr. Compos [sic] could not possibly return to his former position at Sears. He is unable to write, cannot climb, cannot perform meaningfully with his dominant arm, i.e., the right, and has diminished capacity in terms of memory, which would all be exclusionary factors. All of these activities are limited by the allowed conditions.
In my opinion, he has not reached maximum medical improvement. * * *
 {¶ 8} 3. On a February 14, 2003 letter or report addressed to claimant's counsel, two questions were answered in the affirmative by James A. Auberle, M.D.:
Due to the allowed conditions in his Workers' Compensation claim, and particularly seizures, tremors, and dystonia; does Mr. Campos have total loss of use of his right hand?
Due to the allowed conditions in his Workers' Compensation claim, and particularly seizures, tremors, and dystonia; does Mr. Campos have total loss of use of his right upper extremity?
 {¶ 9} 4. On July 23, 2003, claimant moved that his industrial claim be additionally allowed for "closed head injury." He also requested that he be awarded R.C. 4123.57(B) compensation for the loss of use of his right hand and his "right upper extremity." Claimant cited to the reports of Drs. Wade and Auberle.
 {¶ 10} 5. On October 20, 2003, at Sears' request, claimant was examined by Gerald S. Steiman, M.D., who reported:
Manipulative and coordinative activities are absent in the right hand. When writing with a pen, Mr. Campos holds the pen in a fist and uses the forearm movement to write.
* * *
* * * Often while standing he will complain of spasms in the right upper extremity which are not palpable. During the spasms there is increasing tremor. * * *
* * *
* * * When considering the allowed conditions within Claim 953-17190, Mr. Campos' history, medical record review, physical examination and pain assessment do not demonstrate objective neurological or physical evidence to support a total loss of use of his right hand.
When considering the allowed conditions within Claim 953-17190, Mr. Campos' history, medical record review, physical examination and pain assessment do not demonstrate objective neurological or physical evidence to support a total loss of use of his right upper extremity.
Mr. Campos' history, medical record review, physical examination and pain assessment provide insufficient evidence to support a diagnosis of a closed head injury. * * *
 {¶ 11} 6. Following an October 31, 2003 hearing, a district hearing officer ("DHO") issued an order additionally allowing the claim for "closed head injury." The DHO granted R.C. 4123.57(B) compensation for loss of the right hand but denied compensation for the right upper extremity.
 {¶ 12} 7. Sears and claimant administratively appealed the DHO order of October 31, 2003.
 {¶ 13} 8. On January 6, 2004, the administrative appeals were heard by a staff hearing officer ("SHO"). The hearing was recorded and transcribed for the record.
 {¶ 14} On direct examination, claimant's counsel and claimant had the following exchange:
Q. Mr. Campos, as it relates to kind of your day to day living, you are right hand dominant?
A. Right.
Q. The tremors and the [illegible] you have with your hand and your arm, that is already with medication and Botox injections?
A. Right.
Q. Are there times where it's worse than what it is?
A. Yes, when you try to be active with it. Like when he just asked you know, your hand, you know, you go like this (witness indicating), but you know, he's asking me to go like this and if I do that, it will start shaking more —
* * *
A. My hand goes out, like to raise my hand, it starts shaking more and it starts to cramp. It's like a cramping, like you get a Charlie horse in your leg, that's what it's like.
Q. From the standpoint of your capabilities of eating, are you capable of eating at all with your right hand?
A. No. I mean, I can put a utensil in it to hold it, but I mean, no, it's — it's like I said before, It's a joke for my kids. I will do it just so they laugh. I mean, I make a joke about this stuff, you have to, so I just —
Q. And the same would be true with a pen or a pencil?
A. Yes.
Q. You can —
A. Yeah.
Q. You're capable of putting some pressure —
A. Right, right.
Q. But that is the extent?
A. Right.
Q. And is the pressure really coming from your hand or arm, or is basically your body pushing on —
A. Just the pushing down, and sometimes, you know, if I use my left hand to try to hold it still, but that's not one of the best things, it just cramps up.
 {¶ 15} On cross-examination, Sears' counsel and claimant had the following exchange:
Q. Mr. Campos, you testified at the last hearing, and we didn't have that one recorded, but at the last hearing, you testified about some of the things that you're able to do and can't do with your right hand and right arm, correct?
A. Right.
Q. At that hearing, didn't you testify that there are some things that you're capable of doing with your right hand, and I think you testified a little bit earlier today that you are capable of holding a pen, or holding a pencil, correct?
A. Yeah.
Q. Yes?
A. Yes.
Q. You also testified at the last hearing that you were also capable of holding some small objects, like an orange or an apple or something like that, isn't that right?
A. Not eat it, but yeah, I can put it in my hand.
Q. But you're capable of holding it?
A. Because of the exercise, yes, I have to do, yeah.
Q. Would it also be fair to say that you are capable of writing your name but not writing it well with your right hand?
A. Yes, you wouldn't be able to read it, let me put it that way. You would not be able to read it. I couldn't read my own name if I didn't know what my name was.
Q. Right, and I understand that it's hard to read, it's not legible?
A. Yes.
Q. But you are capable of writing you name with your right hand?
A. Yeah, if it's, yeah, you can't read it, yeah. It's scribbly lines is what it is.
* * *
Q. * * * [B]efore the District Hearing Officer at the last hearing, you testified that you are also capable, despite the tremors, of gripping a door knob and opening a door with your right hand. Is that correct?
A. Just like gripping this chair, to make, yeah, the mind — I've just got to concentrate on it.
Q. Now, switching to your arm, at the last hearing, we talked a little bit about your arm as well, because they are two distinct body parts; the hand and the arm.
You testified that you do have some use of your arm, is that correct? For example, you're capable of nudging a door open with your arm, is that correct?
A. If I lean against that door, I can push it open. If I lean against that door, I can push it closed.
Q. I believe at the last hearing you told Ms. Graff that you were capable of nudging the door open with your arm. Do you remember that?
A. Well, that's what I mean. I mean, you know, if I put my arm like this (witness indicating) and push with my weight, yes, I can push it, yes.
Q. And I know that it's difficult for you to do it because it might cause some spasming or cause your arm to, the tremors to intensify, but you are capable of lifting your arm, because you did that at the last hearing?
A. Yes (witness indicating).
 {¶ 16} 9. Following the hearing, the SHO issued an order stating that the DHO's order is "modified." The SHO additionally allowed the claim for "closed head injury, not otherwise specified 959.01, also described as brain concussion (850)." The SHO also awarded R.C. 4123.57(B) compensation for loss of use of the right hand and arm. The SHO's order explains:
It is the finding of this Staff Hearing Officer that the Employer's independent neurological medical evaluator, Ronald R. Wade, M.D., stated his professional medical opinion that
"There is a marked abnormality of posture in the hand. The muscles are extremely rigid throughout the right arm and hand. The right arm and hand shake constantly in a frequency considerably slower than a Parkinsonian tremor and also involves the proximal muscles in an almost dystonic fashion. Fine movements of the right hand are impossible. There also appears to be some weakness in the proximal muscles of the right upper extremity . . .
Tests for coordination are impossible for him to perform with the rightarm but are done fairly accurately with the left arm. Rapid alternating movements are again impossible for him to accomplish with the right arm
but done well on the left. There is no evidence for cerebellar ataxia on heel-to-shin tests.
Considering the allowed conditions in this claim, Mr. Compos [sic] could not possibly return to his former position at Sears. He us unableto write, cannot climb, cannot perform meaningfully with his dominantarm, i.e., the right, and has diminished capacity in terms of memory, which would all be exclusionary factors. All of these activities arelimited by the allowed conditions" (emphasis added).
Dr. Wade's opinion is found to be persuasive.
Therefore, it is the finding of this Staff Hearing Officer that the Injured Worker has lost the use of his dominant right arm and right hand, to the same extent as if it had been amputated, as he "cannot perform meaningfully with his dominant arm, i.e. the right."
Therefore, it is the order of this Staff Hearing Officer that the Injured Worker is hereby awarded two hundred twenty-five (225) weeks compensation, pursuant to O.R.C. Section 4123.57(B), beginning 11/19/2002 (the date of Dr. Wade's report).
This order is based on the 2/14/2003 Questionnaire completed by the Injured Worker's Attending neurologist, James A. Auberle, M.D., the 11/19/2002 report of Ronald R. [W]ade, M.D., the Injured Worker's personal demonstration of the lack of residual functional capacity of the right hand and right arm at hearing on 1/6/2004, the holding of State exrel. Walker v. Industrial Commission (1979), 58 Ohio St. 2d 402, O.R.C. Section 4123.57(B) and O.R.C. Section 4123.95 (which requires that, "Sections 4123.01 to 4123.94, inclusive, of the Revised Code shall beliberally construed in favor of employees and the dependents of deceased employees.").
(Emphasis sic.)
 {¶ 17} 10. On March 25, 2004, another SHO issued an order refusing Sears' administrative appeal from the SHO order of January 6, 2004.
 {¶ 18} 11. On November 24, 2004, relator, Sears Roebuck Co., filed this mandamus action.
 Conclusions of Law: {¶ 19} Two issues are presented: (1) whether the commission's award is supported by some evidence upon which it relied, and (2) whether the commission failed to apply the correct legal standard for loss of use.
 {¶ 20} The magistrate finds: (1) the commission's award is supported by some evidence, and (2) the commission did not fail to apply the correct legal standard for loss of use. Accordingly, as more fully explained below, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.
 {¶ 21} R.C. 4123.57(B) provides a schedule of compensation for the loss of enumerated body parts. It provides for 175 weeks of compensation for loss of a hand. It provides for 225 weeks of compensation for loss of an arm. Here, claimant was awarded 225 weeks of compensation for loss of his right hand and arm. See State ex rel. Cook v. Zimpher (1985),17 Ohio St.3d 236; State ex rel. Samkas v. Indus. Comm. (1982),70 Ohio St.2d 279 (awards are cumulative, not consecutive).
 {¶ 22} A thorough reading of State ex rel. Alcoa Building Products v.Indus. Comm., 102 Ohio St.3d 341, 2004-Ohio-3166, is instructive.
 {¶ 23} In Alcoa, at ¶ 10, the court succinctly set forth the historical development of scheduled awards for loss of use under R.C.4123.57(B). The Alcoa court states:
Scheduled awards pursuant to R.C. 4123.57(B) compensate for the "loss" of a body member and were originally confined to amputations, with the obvious exceptions of hearing and sight. In the 1970's, two cases — Stateex rel. Gassmann v. Indus. Comm. (1975), 41 Ohio St.2d 64, * * * andState ex rel. Walker v. Indus. Comm. (1979), 58 Ohio St.2d 402, * * * — construed "loss," as similarly used in R.C. 4123.58, to include loss of use without severance. Gassmann and Walker both involved paraplegics. In sustaining each of their scheduled loss awards, we reasoned that "[f]or all practical purposes, relator has lost his legs to the same effect and extent as if they had been amputated or otherwise physically removed."Gassmann, 41 Ohio St.2d at 67 * * *; Walker, 58 Ohio St.2d at 403-404[.] * * *
 {¶ 24} In Alcoa, the claimant sustained a left arm amputation just below the elbow. Continuing hypersensitivity at the amputation site prevented the claimant from ever wearing a prosthesis. Consequently, the claimant moved for a scheduled-loss award for loss of use of his left arm.
 {¶ 25} Alcoa established through a videotape that the claimant could use his remaining left arm to push open a car door and to tuck paper under the arm. Nevertheless, the commission granted the claimant an award for the loss of use of his left arm.
 {¶ 26} This court denied Alcoa's complaint for a writ of mandamus and Alcoa appealed as of right to the Supreme Court of Ohio.
 {¶ 27} Affirming this court's judgment and upholding the commission's award, the Alcoa court explained, at ¶ 10-15:
* * * Alcoa urges the most literal interpretation of this rationale and argues that because claimant's arm possesses some residual utility, the standard has not been met. The court of appeals, on the other hand, focused on the opening four words, "for all practical purposes." Using this interpretation, the court of appeals found that some evidence supported the commission's award and upheld it. For the reasons to follow, we affirm that judgment.
Alcoa's interpretation is unworkable because it is impossible to satisfy. Walker and Gassmann are unequivocal in their desire to extend scheduled loss benefits beyond amputation, yet under Alcoa's interpretation, neither of those claimants would have prevailed. As the court of appeals observed, the ability to use lifeless legs as a lap upon which to rest a book is a function unavailable to one who has had both legs removed, and under an absolute equivalency standard would preclude an award. And this will always be the case in a nonseverance situation. If nothing else, the presence of an otherwise useless limb still acts as a counterweight — and hence an aid to balance — that an amputee lacks. Alcoa's interpretation would foreclose benefits to the claimant who can raise a mangled arm sufficiently to gesture or point. It would preclude an award to someone with the hand strength to hold a pack of cards or a can of soda, and it would bar — as here — scheduled loss compensation to one with a limb segment of sufficient length to push a car door or tuck a newspaper. Surely, this could not have been the intent of the General Assembly in promulgating R.C. 4123.57(B) or of Gassmann and Walker.
Pennsylvania defines "loss of use" much as the court of appeals did in the present case, and the observations of its judiciary assist use here. In that state, a scheduled loss award requires the claimant to demonstrate either that the specific bodily member was amputated or that the claimant suffered the permanent loss of use of the injured bodily member for all practical intents and purposes. Discussing that standard, one court has written:
"Generally, the `all practical intents and purpose' test requires a more crippling injury than the `industrial use' test in order to bring the case under section 306(c), supra. However, it is not necessary that the injured member of the claimant be of absolutely no use in order for him to have lost the use of it for all practical intents and purposes."Curran v. Walter E. Knipe Sons, Inc. (1958), 185 Pa.Super. 540, 547,138 A.2d 251.
This approach is preferable to Alcoa's absolute equivalency standard. Having so concluded, we further find that some evidence indeed supports the commission's decision. Again, Dr. Perkins stated:
"It is my belief that given the claimant's residual hyper-sensitivity, pain, and tenderness about his left distal forearm, that he is unable to use his left upper limb at all and he should be awarded for the loss of use of the entire left upper limb given his symptoms. He has been given in the past loss of use of the hand, but really he is unable to use a prosthesis since he has had the amputation, so virtually he is without the use of his left upper limb * * *."
In its brief, Sears characterizes claimant's hearing testimony:
* * * [R]espondent testified he can hold a pencil, he can hold a piece of fruit, he can grip a door knob and open a door, and he can write his name, albeit poorly. * * * In fact, respondent demonstrated how he writes with his right hand and verified his signature on a power of attorney form, which he wrote with his right hand. * * * Respondent also testified he is capable of lifting his right arm and can use the arm to push a door open. * * *
(Relator's brief at 2.)
 {¶ 28} According to relator, neither Dr. Wade's report nor claimant's hearing testimony provides some evidence showing that claimant has lost the use of his right hand and arm as if by amputation or for all practical intents and purposes.
 {¶ 29} Sears argues:
* * * Respondent clearly has some function of both the right hand and arm, as he can hold objects, write, grip a doorknob and open a door and push a door. * * * If respondent's disability were the same as if the arm and hand had been removed, he would be completely unable to perform any of these functions. These functions, while limited, demonstrate that respondent's right hand and arm are not completely useless to him.
* * *
* * * Dr. Wade's report does not explain what is meant by "performing meaningfully" with the right arm. As a practical matter, there are dozens of daily functions ordinary people perform with their arms and hands. Dr. Wade's report merely provides respondent has a loss of coordination in the right arm, the inability to perform fine motor skills, and the inability to write. Nevertheless, there remain many useful functions of the arm, and especially the hand, in the absence of coordination and fine motor functionality. Writing skillfully is merely one function of the hand. Respondent demonstrated, by way of his testimony, that there are other useful functions of [the] right hand from which he benefits. Considering the multitude of functions of the hand and arm, Dr. Wade's finding does not mean respondent has a total loss of use of the hand and arm as contemplated by Ohio courts. * * *
(Relator's brief at 5-6.)
 {¶ 30} In its reply brief, Sears further argues:
Because Respondent has lost the fine motor abilities of his right hand and coordination in the hand and arm, the staff hearing officer ("SHO") concluded he has lost the use of his hand and arm. Nevertheless, the arm and especially the hand, are used for gross motor functions as well as fine motor functions. Respondent testified he retains gross motor functionality of his right hand and arm as he can use his hand to hold objects, write, grip a doorknob and open a door. * * * Additionally[,] Respondent demonstrated the strength to lift his right arm and testified he can use the arm to push a door. * * * Arguably, where the hand is concerned, the gross motor functions of the hand are as important as the fine motor functions.
If Respondent has the strength to grip and turn a doorknob, then he also has the strength to open a shower door and turn on the shower. He would have the strength to operate any household faucet. He would have the strength [to] hold a wash cloth and bathe large parts of his body. He would be able to gather clothing and use the right hand as an assist to fold clothes. He would be able to place utensils, cups, and plates into a dishwasher. He would be able to use the right hand to assist in dressing himself. Respondent may or may not be able to squeeze a tube of toothpaste, but he would be able to hold the toothbrush while applying the toothpaste with his unaffected left hand.
Together, gross and fine motor functions comprise the total functionality of the hand. The total and permanent loss of use of the hand, as if by amputation, connotes a loss of both the fine motor and gross motor functions of the hand. All of the above-described gross motor functions demonstrate the residual usefulness of Respondent's right hand. To find a loss of use based solely on the loss of fine motor functionality, where the evidence shows clear residual gross motor functionality, emasculates the language of R.C. 4123.57(B) and distorts the holdings of [State ex rel. Gassmann v. Indus. Comm. (1975),41 Ohio St.2d 64] and its progeny.
(Relator's reply brief at 1-2.)
 {¶ 31} The magistrate finds Sears' arguments unpersuasive.
 {¶ 32} To begin, relator seems to suggest that, anatomically, the functions of the hand and arm can be divided into fine and gross motor functions, and that claimant's testimony and Dr. Wade's report indicate that claimant retains the gross motor functionality of his right hand. Relator then claims that gross motor functions are as important as fine motor functions, as if to suggest that the commission's decision is premised solely upon loss of fine motor functionality. In fact, Sears ultimately and incorrectly claims that the commission's award is premised "solely" on the loss of fine motor functionality.
 {¶ 33} While Dr. Wade, at one point in his report, concludes that "[f]ine movements of the hand are impossible," he never opines or even suggests that claimant retains all so-called "gross motor functionality" of his right hand and arm. In fact, the terms "gross motor" or "gross motor functionality" are terms that Sears has chosen to use here yet never defines those terms.
 {¶ 34} Taber's Cyclopedic Medical Dictionary (18 Ed. 1997) defines "fine motor skill": "Any of the skills [pertaining] to the synergy of small muscles, primarily in the hand, and related to manual dexterity and coordination." Id. at 728.
 {¶ 35} Taber's defines "gross motor skill": "Skills [pertaining] to the synergy of large muscle groups, as in balancing, running, and throwing." Id. at 825.
 {¶ 36} When those terms are defined, it remains clear that the commission did not find loss of use based "solely" upon loss of fine motor functionality of the right hand and arm.
 {¶ 37} Sears also seems to suggest that because claimant can place his signature on form C-230 (Stipulated Record at 7), the commission must conclude that he indeed can write with his right hand and arm, albeit, not "skillfully." However, even Sears' own doctor, Dr. Steiman, describes the difficulty. According to Dr. Steiman, claimant "holds the pen in a fist and uses the forearm movement to write." Given claimant's hearing testimony as to how he can write, along with Dr. Wade's report, it was clearly within the commission's fact-finding discretion to conclude that claimant cannot perform this task "meaningfully."
 {¶ 38} Sears argues "[i]f Respondent has the strength to grip and turn a doorknob," then he must have the ability to turn on a shower, operate a household faucet, bathe his body with a wash cloth, gather clothing, and place utensils into a dishwasher.
 {¶ 39} Sears' argument is apparently developed from claimant's hearing testimony, as previously noted, where claimant indicates that he can grip a doorknob or a chair but only under a condition — "I've just got to concentrate on it."
 {¶ 40} However, Sears' argument seems to ignore the condition — concentration — which must be there in order for claimant to be able to grip a doorknob.
 {¶ 41} Sears' argument also seems to suggest that relator can multiply the performance of similar tasks of daily living such as filling a dishwasher with "utensils, cups, and plates." There is simply no evidence from claimant's testimony or from the medical evidence that claimant can multiply the gripping performance to the degree suggested by Sears.
 {¶ 42} In fact, Dr. Wade again states:
* * * He has a severe tremor in the right hand. That hand tends to assume a claw posture. * * *
* * *
There is a marked abnormality of posture in the right hand. The muscles are extremely rigid throughout the right arm and hand. The right arm and hand shake constantly in a frequency considerably slower than a Parkinsonian tremor and also involves the proximal muscles in an almost dystonic fashion. * * *
 {¶ 43} At best, Sears' arguments point to some residual capacity in claimant's right hand and arm. Relator can manage, with great difficulty, to produce an illegible signature on a form. He can put an orange or apple in his right hand but he can't eat the orange or apple from his right hand. He can place an eating utensil in his right hand but he cannot use the utensil to eat from his right hand.
 {¶ 44} As the Alcoa case makes clear, it is not necessary that the injured member of the claimant be of absolutely no use in order for the claimant to have lost the use of it for all practical intents and purposes. Thus, that claimant admits of some very limited use of his hand and arm does not necessarily detract from the commission's conclusion that claimant has lost the use of his hand and arm.
 {¶ 45} As previously noted, the second issue is whether the commission failed to apply the correct legal standard for loss of use. According to Sears, the commission applied a "meaningful use" test rather than the standard set forth in Alcoa, supra. In Alcoa, the court adopted the "all practical intents and purpose" test used by the Pennsylvania courts. Perhaps it can be said that the test, adopted in Alcoa, clarifies or even expands, the standard for loss of use that the Supreme Court of Ohio addressed initially in State ex rel. Gassman v. Indus. Comm. (1975),41 Ohio St.2d 64, and State ex rel. Walker v. Indus. Comm. (1979),58 Ohio St.2d 402, where it was held that compensable loss occurs when, for all practical purposes, the claimant has lost the member to the same effect and extent as if it had been amputated or otherwise removed.
 {¶ 46} While the SHO's order of January 6, 2004 does not set forth the standard, it does specifically state that it is based upon the Walker
holding which does set forth the standard.
 {¶ 47} There is a presumption of regularity that attaches to commission proceedings. State ex rel. Lovell v. Indus. Comm. (1996),74 Ohio St.3d 250, 252. Here, given that the SHO's order actually states that it is based on the Walker holding, the presumption is that the SHO indeed applied the correct standard.
 {¶ 48} Moreover, Sears does not rebut the presumption by pointing to the SHO's reliance upon Dr. Wade's conclusion that claimant "cannot perform meaningfully with his dominant arm." Dr. Wade's duty as an examining physician was to render findings as to claimant's anatomical impairment, which he did. Dr. Wade was not required to apply a legal definition of loss in his report.
 {¶ 49} Apparently, the SHO felt that Dr. Wade's conclusion that claimant "cannot perform meaningfully with his dominant arm," aptly describes the impairment detailed in Dr. Wade's report. That apt description of the impairment does indeed support the commission's conclusion that claimant has lost the use of his right hand and arm under the holding of Walker and its progeny.
 {¶ 50} In short, Sears has failed to rebut the presumption of regularity — that the commission here was aware of the legal standard for loss of use and applied the standard to the medical findings relied upon.
 {¶ 51} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.